# Supreme Court of Texas

---

No. 21-0461

---

Point Energy Partners Permian, LLC, et al.,

*Petitioners,*

v.

MRC Permian Company,

*Respondent*

---

On Petition for Review from the
Court of Appeals for the Eighth District of Texas

---

**Argued October 25, 2022**

JUSTICE DEVINE delivered the opinion of the Court.

This mineral-lease dispute concerns the interpretation of a force majeure clause. Typically, a lessee invokes a force majeure clause to avoid the harsh result of lease termination when confronted with circumstances beyond its control that impede compliance with a lease deadline or obligation. But here, the lessee mistakenly scheduled operations to drill a new well to commence after the deadline to suspend lease termination under a continuous-drilling program. After missing the deadline, the lessee discovered its scheduling error and only then

invoked the lease's force majeure clause, referencing an allegedly qualifying event that had occurred nearly a month before the drilling deadline. Though the event did not cause the lessee to miss the deadline, the lessee argues the clause extended the drilling deadline and prevented the lease from terminating. We disagree.

As with other lease clauses, the application of a force majeure clause depends on the terms the contracting parties freely chose. The clause here provides that "[w]hen Lessee's operations are delayed by an event of force majeure, being a non-economic event beyond Lessee's control," and timely notice is given, the lease shall "remain in force" during the delay and the lessee shall have 90 days to "resume operations." According to the lessee, its invocation of the clause retroactively kept its lease "in force" through the deadline because an earlier wellbore instability on an unrelated lease (the alleged force majeure event) required that the lessee effectively redrill portions of that well, setting back its rig schedule for subsequent drilling on other leases—including the untimely scheduled operation—by 30 hours. Before receiving notice, however, the lessors signed new leases. Contending the force majeure clause extended the lease, the original lessee sued the putative successor in interest and others for, among other claims, tortious interference with its lease. The putative successor responded that the original lease terminated when the lessee missed the deadline and that the size of any retained interests in production units for already-drilled wells was limited.

On cross-motions for summary judgment, the trial court determined that (1) the force majeure clause did not extend the lease as

a matter of law, (2) the putative successor was entitled to a take-nothing summary judgment on the lessee's tortious-interference claims, and (3) the lessee's retained production units were not limited as a matter of law to the smaller of two possible capped sizes. On permissive interlocutory appeal, the court of appeals focused on the phrase "Lessee's operations are delayed" to conclude that the lease deadline and untimely scheduled drilling date were irrelevant for invoking the force majeure clause. Reversing the trial court's judgment and remanding the case, the appellate court determined that fact issues exist both as to whether the clause applied and as to each element of the lessee's tortious-interference claims and that, given its holdings, the issue of the production-unit size was not "ripe" for decision.

We hold that, construed in context, "Lessee's operations are delayed by an event of force majeure" does not refer to the delay of a necessary drilling operation already scheduled to occur after the deadline for perpetuating the lease. We therefore (1) reverse the court of appeals' judgment on the force majeure and tortious-interference issues, (2) render judgment that the force majeure clause did not save the lease, (3) render a take-nothing judgment in part on the lessee's tortious-interference claims to the extent those claims are predicated on the force majeure clause's saving the lease, and (4) remand the case to the court of appeals to consider two issues preserved but not reached: the size of the production units when the lease terminated and whether the evidence raised a fact issue supporting the lessee's tortious-interference claims regarding any leasehold interest in the retained production units.

3

## I. Background

## A. The MRC Lease

In 2014, the Lessors[1] executed four identical leases (collectively, the MRC Lease) granting MRC Permian Company an exclusive leasehold estate of around 4,000 gross acres in Loving County for exploring, developing, producing, and marketing oil and gas. The MRC Lease's primary term ended on February 28, 2017. During the primary term, MRC drilled five horizontal oil wells, spudding[2] the last well—the Totum well—on November 22, 2016.

The lease provisions, including a retained-acreage clause,[3] provide that after the primary term, the lease "shall automatically divide" into separate production units and terminate as to all lands and depths not then included in a production unit. A production unit, as defined by the lease, is the area and depths of the lease allocated to a producing well. Within 90 days after completing a well, MRC "shall file"

---

[1] The Lessors are (1) TJ Bar, LLC, with Holland Acquisitions, Inc., d/b/a Holland Services as its agent; (2) Tubb Memorial, LP, with Bank of America, N.A., as its agent; (3) The Deborah Jackson Revocable Trust, with PlainsCapital Bank as its trustee; and (4) Janelle Jackson Marital Trust Part M2, Janelle Jackson Marital Trust Part M1, and Family Credit Shelter Trust Part B, with Bank of America, N.A. as their trustee.

[2] "'Spudding-in' is a term of art in the oil-and-gas industry that means '[t]he first boring of the hole in the drilling of an oil well.'" *Sundown Energy LP v. HJSA No. 3, Ltd. P'ship*, 622 S.W.3d 884, 886 n.1 (Tex. 2021) (quoting Patrick H. Martin & Bruce M. Kramer, WILLIAMS & MEYERS—MANUAL OF OIL AND GAS TERMS 1007 (16th ed. 2015)).

[3] A retained-acreage clause "typically divides the leased acreage such that production or development will preserve the lease only as to a specified portion." *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 598 (Tex. 2018).

a written designation of the production unit in the county where the well is located. For a horizontal oil well, the production unit "shall not exceed" either 160 or 320 acres (plus 10% tolerance) depending on whether "more than 5000 feet of its wellbore extends horizontally in the producing formation."

MRC could "temporarily suspend automatic termination" of the lease at the end of the primary term by conducting a continuous-drilling program, and the "lease will remain in force . . . so long as the Continuous Drilling Program is conducted by Lessee." Under that program, MRC had to spud a new well every 180 days measured from the spud date of the last well. If not, the MRC Lease "shall terminate as to all lands and depths" not then included in a production unit. Because MRC spudded the Totum well on November 22, 2016, MRC had until May 21, 2017, to spud a new well and continue "temporarily suspend[ing]" the lease's termination.

In early 2017, MRC's executive committee scheduled a May 11 spudding of a sixth well—the Toot 211 well—using Patterson Drilling Rig 295, the same rig it had used to drill the Totum well. Rig 295, according to MRC, is "specially equipped to handle the high pressures" found in Loving County, and its "special equipment and crew make Rig 295 safer and more efficient for the area than other rigs."

Subsequently, however, MRC's operations team created a new drilling schedule. By April 18, Rig 295's schedule listed June 2 as the spud date for the Toot 211 well and erroneously identified June 19, rather than May 21, as the MRC Lease's expiration date absent a timely spudded well. Around two weeks after the correct expiration date, MRC

5

discovered the scheduling mistake. MRC concedes it had mistakenly calculated June 19 as the expiration date based on the rig-release date from the Totum well, rather than its spud date as required by the lease.

## B. Force Majeure

Having missed the May 21 deadline to continue "temporarily suspend[ing]" lease termination, and upon discovering its scheduling mistake, MRC determined in early June that an April 21 force majeure event provided 90 days from resolution of that event to spud the Toot 211 well. The lease provision MRC relied on provides:

> **13. Force Majeure.** When Lessee's operations are delayed by an event of force majeure, being a non-economic event beyond Lessee's control, if Lessee shall furnish Lessor a reasonable written description of the problem encountered within 60 days after its commencement, and Lessee shall thereafter use its best efforts to overcome the problem, this lease shall remain in force during the continuance of such delay, and Lessee shall have 90 days after the reasonable removal of such majeure within which to resume operations; provided, however, this paragraph shall not extend this lease or relieve Lessee for liability for any breach thereof for a period in excess of 180 days, and Lessee's obligation to pay sums due hereunder shall not be affected by an event of force majeure.

MRC sent force majeure notices to the Lessors on June 13— 53 days after the alleged force majeure event and more than three weeks after the MRC Lease would have terminated under the May 21 continuous-drilling deadline if no savings clause applied.[4] In the

---

[4] Savings clauses, including force majeure clauses, are lease provisions designed to prevent automatic termination of a lease. *See BP Am. Prod. Co. v. Red Deer Res., LLC*, 526 S.W.3d 389, 394 (Tex. 2017) ("Many mineral leases contain savings clauses designed to prevent the automatic termination of the

6

notices, MRC alleged that around April 21, MRC began experiencing "operational issues with the rig scheduled to drill the Toot 211 well" and "wellbore stability issues that required a reaming operation for over 2,500 feet of the lateral," which "have caused a delay in drilling the Toot 211 well beyond MRC's control."[5]  The notices did not mention the erroneously scheduled June 2 spud date; in fact, the notices referenced the earlier schedule, claiming the Toot 211 well "was scheduled to be spud[ded] . . . on May 11, 2017."  MRC alerted the Lessors that it "currently anticipates that a rig will be arriving at the Lease acreage to drill the Toot 211 well as early as next week."

Discovery during litigation revealed that the delay caused by the April 21 wellbore instability lasted for only 30 hours while Rig 295 was drilling a well—the Dorothy White well—on an unrelated lease 60 miles away.  This wellbore instability, as MRC's senior vice president of operations later explained, occurred when MRC was running production casing and the wellbore caved in.  MRC overcame the problem through a reaming operation, redrilling over 2,500 feet of the wellbore.  According to MRC, the delay on the Dorothy White well "necessarily set

---

lease upon a cessation of production."); *Hardin-Simmons Univ. v. Hunt Cimarron Ltd. P'ship*, No. 07-15-00303-CV, 2017 WL 3197920, at *7 (Tex. App.—Amarillo July 25, 2017, pet. denied) ("The category of clauses that might extend the duration of an oil and gas lease beyond a determinable condition, generally known as 'savings clauses,' include, among others, the 'drilling operations clause,' 'continuous operations clause,' or 'reworking clause.'"); 4 Patrick H. Martin & Bruce M. Kramer, WILLIAMS & MEYERS, OIL AND GAS LAW § 683 (LexisNexis Matthew Bender 2022) ("Another such savings clause which has made its way into leases . . . is the so-called *force majeure* clause.").

[5] On appeal, MRC does not allege any rig "operational issues" other than the delay due to the wellbore instability that required a reaming operation.

back the schedule for all of the subsequent wells on [Rig 295]'s schedule by approximately 30 hours, including the drilling of the Toot #211."

As noted on Rig 295's April 18 schedule, two other wells on another unrelated lease—the Barnett wells—were scheduled to be drilled before the Toot 211 well. On April 24, after completing the Dorothy White well, MRC moved Rig 295 to drill the Barnett wells, and as of the May 21 deadline for the MRC Lease, MRC was still drilling those wells. MRC's drilling superintendent and its expert admitted that MRC would have had enough time to move Rig 295 to the Toot 211 well and commence drilling by early May, but they explained that MRC chose to drill the Barnett wells first.

On June 15, Point Energy Partners Permian, LLC, instead of the Lessors, responded to MRC's June 13 force majeure notices. Point Energy explained that after reviewing publicly available drilling data, it "questioned whether MRC's drilling schedule was sufficient to maintain the Continuous Development Program" and therefore had taken "leases from the mineral owners" on June 7. Point Energy requested documentation regarding the force majeure event but did not dispute that MRC is entitled to a leasehold interest in production units for the five wells already drilled. Finally, Point Energy stated that without additional information, it had "serious concerns that any entry onto the land to drill the Toot 211 may constitute bad faith trespass."

## C. Procedural History

MRC sued Point Energy; the Lessors and their trustees and agents; and certain entities affiliated with Point Energy,[6] alleging trespass to title and that (1) some of the Lessors, trustees, and agents had repudiated and breached the MRC Lease by signing new leases with Point Energy; and (2) Point Energy and the affiliated defendants had engaged in a civil conspiracy and tortiously interfered with an existing contract in their efforts to acquire the new leases from the Lessors. MRC also sought declaratory relief that the MRC Lease remains in full force and effect, that MRC met all requirements to suspend its drilling obligation, that the force majeure clause should be construed not to include certain additional requirements to invoke the clause,[7] and that the production-unit size should be 320 acres plus 10% tolerance if the MRC Lease terminated.

Point Energy and other defendants (collectively, Point Energy) counterclaimed for breach of the MRC Lease, trespass to try title, and an accounting and constructive trust. As part of their trespass-to-try-title claim, the counter-plaintiffs asserted that MRC is limited to 160 acres plus 10% tolerance for each production unit because the wellbores do not "extend[] horizontally in the producing formation"

---

[6] These affiliated entities are Robert Gaudin, John Sabia, Bryan Moody, and Vortus Investment Advisors, LLC. MRC later nonsuited its claims against Gaudin.

[7] Specifically, MRC requested declarations that (1) the force majeure event "does not have to occur on the Leasehold Estate" or "cause MRC to miss a deadline" and (2) MRC does not have to "try to conduct operations . . . before the 90-day extended deadline" or "try to overcome the *effects* of the force majeure."

9

"more than 5000 feet" and MRC did not satisfy the written-designation requirement for allocating acreage to each well.

Point Energy then moved for partial summary judgment that the force majeure clause did not perpetuate the MRC Lease, arguing that the alleged force majeure event was economically motivated and within MRC's control; the delayed operations had to be "on-lease"; the scheduling error rather than the force majeure event caused the delay; and the delay was foreseeable. MRC responded with a cross-motion for partial summary judgment, requesting declarations regarding the construction of the clause and arguing that Point Energy seeks to impose requirements not in the clause.[8] Point Energy then moved for traditional and no-evidence summary judgment on all claims.

The trial court granted Point Energy's motion for partial summary judgment on the force majeure issue and denied MRC's corresponding motion; denied Point Energy's motion to limit the production units to 160 acres each; and granted Point Energy's motion for a take-nothing summary judgment on MRC's tortious-interference claims. Based on these rulings, the trial court declared the MRC Lease to have terminated "as of May 22, 2017," as to all property not included in a production unit. The trial court then permitted a permissive interlocutory appeal from the order, identifying three controlling questions of law: (1) "whether the [MRC Lease] terminated as to the portion of the Leasehold Estate not included in a Production Unit for a Commercial Well by May 22, 2017"; (2) "what is the size of the

---

[8] MRC also moved for traditional and no-evidence summary judgment on the breach-of-contract counterclaim, which the trial court denied.

10

Production Units retained under the [MRC Lease]"; and (3) "if the [MRC Lease] did not terminate, whether the Point [Energy] Leases, and/or the acts of Defendants related thereto, can support a claim for tortious interference under Texas law."[9]

The court of appeals accepted the interlocutory appeal,[10] reversed the trial court's judgment in part,[11] and remanded the case. As to the force majeure dispute, the court distilled the disagreement to three issues: (1) whether the force majeure event needed to be "on-lease";[12] (2) whether the event must have caused MRC to miss a lease deadline and not just delay operations; and (3) whether the event was under MRC's control and driven by financial considerations.[13] The court held

---

[9] *See* TEX. CIV. PRAC. & REM. CODE § 51.014(d).

[10] 624 S.W.3d 643, 650-51 (Tex. App.—El Paso 2021) (citing TEX. CIV. PRAC. & REM. CODE § 51.014(f)).

[11] Although the court of appeals reversed the trial court's judgment on the primary issues, the court also (1) affirmed the trial court's denial of MRC's motion for summary judgment on both the force majeure issue and the breach-of-contract counterclaims and the trial court's "ruling that TJ Bar cannot be held liable for tortious interference with its own lease with MRC," (2) did not reach the trial court's ruling on MRC's estoppel defense, and (3) severed and abated the appeal as to Holland Acquisitions after it filed for bankruptcy. *Id.* at 651 n.2 & n.4, 663, 670.

[12] The parties dispute the court of appeals' characterization of this specific issue. Point Energy claims the court "thought the issue was whether the force majeure event had to occur on the Lease, not the delayed operations," but "[t]he parties agree the force majeure clause requires delayed operations on the Lease no matter where the triggering event occurs." MRC asserts, "The delayed operations that matter are those on the lease, and the court of appeals did not hold otherwise. The only disputed issue has always been the location of the triggering event."

[13] *Id.* at 658-61.

11

that the MRC Lease did not require the force majeure event to be "on-lease" or to cause MRC to miss a lease deadline; even if there were a causation requirement, testimony from MRC's employee raised a fact issue; and the record "is fraught with conflicting evidence" on MRC's control over and economic motivation for the force majeure event.[14] Given the "uncertainty surrounding the continued existence of MRC's lease," including "when the new [Point Energy] leases were negotiated and signed," the court concluded that the question of the production-unit size was unripe and that "there is a genuine issue of material fact as to each element of MRC's tortious interference claims."[15]

We granted Point Energy's petition for review, which contends in three issues: (1) the court of appeals erred in holding the force majeure clause applied when only off-lease operations and plans were delayed, MRC would have missed its deadline even if the alleged force majeure event had never occurred, and this failure resulted from MRC's choices—not events beyond its control; (2) the production-unit question should be decided in its favor as a matter of law; and (3) no fact issues exist on the elements of MRC's tortious-interference claims.

---

[14] *Id.*

[15] *Id.* at 664-69; *see id.* at 670-71 (Alley, J., concurring and dissenting) (disagreeing with the majority that a fact issue exists as to the "willful and intentional act of interference" element of MRC's tortious-interference claims).

12

## II. Discussion

We review summary judgments and construe mineral leases de novo.[16] A traditional summary-judgment movant will prevail only by establishing that no material fact issue exists and it is entitled to judgment as a matter of law.[17] A lease that has a "certain and definite meaning" is unambiguous and interpreted as a matter of law; but if it is subject to more than one reasonable interpretation, summary judgment is improper.[18] When both parties move for summary judgment on an issue and the trial court grants one motion and denies the other, we review the summary-judgment evidence and render judgment that the trial court should have rendered.[19]

General contract-construction principles govern the construction of an oil-and-gas lease, although special interpretation rules also apply because the lease determines interests in real property.[20] Consistent with the law's "strong public policy favoring freedom of contract," contracting parties are generally free to determine the lease's terms, and those terms define their respective rights and duties.[21] Our duty is to

---

[16] *See Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 218 (Tex. 2022); *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 595 (Tex. 2018).

[17] TEX. R. CIV. P. 166a(c); *Rosetta Res.*, 645 S.W.3d at 218.

[18] *Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC*, 639 S.W.3d 682, 690 (Tex. 2022); *Rosetta Res.*, 645 S.W.3d at 219.

[19] *Rosetta Res.*, 645 S.W.3d at 218.

[20] *See Discovery Operating*, 554 S.W.3d at 595; *XOG Operating, LLC v. Chesapeake Expl. Ltd. P'ship*, 554 S.W.3d 607, 611-12 (Tex. 2018).

[21] *Discovery Operating*, 554 S.W.3d at 595 (quoting *Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 471 (Tex. 2016)).

"respect and enforce" those terms by ascertaining the parties' intent as expressed within the lease's four corners.[22] To that end, we examine the entire lease, focusing on the plain language, considering the context in which words are used, and attempting to harmonize all the lease's parts to "determine, objectively, what an ordinary person using those words under the circumstances in which they are used would understand them to mean."[23] We also construe contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served, and avoiding unreasonable constructions when possible and proper."[24]

## A. The Force Majeure Clause

Generally speaking, a force majeure clause is a "contractual provision allocating the risk of loss if performance becomes impossible or impracticable, esp[ecially] as a result of an event or effect that the parties could not have anticipated or controlled."[25] Force majeure clauses, however, come in many shapes, sizes, and forms.[26] For

---

[22] *Id.* at 595 (quoting *White*, 490 S.W.3d at 471).

[23] *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020) (quoting *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 764 (Tex. 2018)).

[24] *Id.* at 148 (quoting *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015)).

[25] *Force-Majeure Clause*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see* 5 Nancy Saint-Paul, SUMMERS OIL AND GAS § 57:28 (rev. 3d ed. 2018) ("The force majeure clause protects the lessee when events that are beyond the lessee's control intervene to delay performance of the lease covenants.").

[26] Martin & Kramer, *supra* note 4, at § 683.1 (noting that "[t]he verbiage of *force majeure* clauses varies from approximately fifty words to five or six hundred words" and describing some of "the many variants of *force majeure* clauses"); 4 Eugene Kuntz, A TREATISE ON THE LAW OF OIL AND GAS § 53.5

example, in oil-and-gas leases, these clauses may vary according to their:

- "force majeure" definition;[27]

---

(1990) (noting that force majeure clauses "vary considerably" regarding "the enumerated causes which will constitute a force majeure" and "the type of performance that will be excused").

[27] For example, the clause may define force majeure by (1) specifying a list of qualifying events, *see, e.g.*, *In re Nueces Petroleum Corp.*, No. 05-44617, 2007 WL 418889, at *2 (Bankr. S.D. Tex. Feb. 2, 2007) ("[B]y operation of force majeure including storm, flood or other act of God, fire, war, rebellion, insurrection, riot, or as a result of some order, requisition, or necessity of any governmental agency having jurisdiction[.]"); (2) listing events with a catchall, *see, e.g.*, *TEC Olmos, LLC v. ConocoPhillips Co.*, 555 S.W.3d 176, 179 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (listing force majeure events of "fire, flood, storm, act of God, governmental authority, labor disputes, war or *any* other *cause* not enumerated herein but which is *beyond the reasonable control of the Party whose performance is affected*"); *Roland Oil Co. v. R.R. Comm'n*, No. 03-12-00247-CV, 2015 WL 870232, at *5 (Tex. App.—Austin Feb. 27, 2015, pet. denied) (including as force majeure events those caused "by a strike, fire, war, civil disturbance, act of god; by federal, state, or municipal laws; by any rule, regulation, or order of a governmental agency; by inability to secure materials; *or by any other cause or causes beyond reasonable control of the party*"); *Va. Power Energy Mktg., Inc. v. Apache Corp.*, 297 S.W.3d 397, 403 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) ("The term '*Force Majeure*' as employed herein means any cause not reasonably within the control of the party claiming suspension . . . [and] shall include, but not be limited to . . . physical events such as acts of God, landslides, lightning, earthquakes, fires, storms or storm warnings, such as hurricanes, which result in evacuation of the affected area, floods, washouts, explosions, breakage or accident or necessity of repairs to machinery or equipment or lines of pipe."); or (3) broadly defining the event with or without carve-outs, *see, e.g.*, *El Paso Mktg., L.P. v. Wolf Hollow I, L.P.*, 383 S.W.3d 138, 140 n.6 (Tex. 2012) ("[A]n 'Event of Force Majeure' means any act or event that prevents the affected Party from performing its obligations (other than the payment of money) under this Agreement if such act or event is beyond the reasonable control of and not a result of the negligence or intentional act of the affected Party[.]").

- causal-nexus requirement;[28]

- remedial-action requirement;[29]

- notice requirement;[30] and

---

[28] Among other alternatives, the clause may require that the force majeure event (1) caused the failure to perform, *see, e.g.*, *Va. Power*, 297 S.W.3d at 403 ("[N]either party shall be liable to the other for failure to perform a Firm obligation, to the extent such failure was caused by *Force Majeure*."); (2) prevented or hindered compliance, *see, e.g.*, *Perlman v. Pioneer Ltd. P'ship*, 918 F.2d 1244, 1246 (5th Cir. 1990) ("This lease shall not be terminated . . . if compliance . . . is prevented or hindered by" a force majeure event.); *TEC Olmos*, 555 S.W.3d at 179 ("Should either Party be prevented or *hindered* from complying with any obligation . . . by *reason of*" force majeure events, then the performance of the obligation is suspended.); or (3) delayed or interrupted operations, *see, e.g.*, *Nueces Petroleum*, 2007 WL 418889, at \*2 ("When any of the operations contemplated by this lease are delayed or interrupted by operation of force majeure . . . the time of such delay or interruption shall not be counted against Lessee."); *Sun Operating Ltd. P'ship v. Holt*, 984 S.W.2d 277, 280 (Tex. App.—Amarillo 1998, pet. denied) ("When drilling or other operations are delayed or interrupted by" force majeure events, "the time of such delay or interruption shall not be counted against Lessee[.]").

[29] Some options include requiring due diligence or reasonable efforts (1) to overcome or mitigate the effects, *see, e.g.*, *El Paso Mktg.*, 383 S.W.3d at 140 n.6 (requiring that a party affected by force majeure "has been unable by the exercise of due diligence to overcome or mitigate the effects of such act or event"); (2) to remove the force majeure event, *see, e.g.*, *Perlman*, 918 F.2d at 1246 ("Lessee shall use all reasonable efforts to remove such force majeure[.]"); *Kodiak 1981 Drilling P'ship v. Delhi Gas Pipeline Corp.*, 736 S.W.2d 715, 716 (Tex. App.—San Antonio 1987, writ ref'd n.r.e.) (requiring that force majeure "shall so far as possible, be remedied with all reasonable dispatch"); or (3) both, *see, e.g.*, *Va. Power*, 297 S.W.3d at 403 ("Seller and Buyer shall make reasonable efforts to avoid the adverse impacts of a *Force Majeure* and to resolve the event or occurrence once it has occurred[.]").

[30] Some clauses, for example, may require written notice within a certain time. *See, e.g.*, *Perlman*, 918 F.2d at 1246 ("Lessee shall notify Lessor in writing . . . within fifteen days of any force majeure[.]"). Others may require notice only "as promptly as possible." *See, e.g.*, *Zurich Am. Ins. Co. v. Hunt Petroleum (AEC), Inc.*, 157 S.W.3d 462, 464 (Tex. App.—Houston [14th Dist.]

- grace period excusing or delaying contractual performance.[31]

As with other mineral-lease clauses, the application of a particular force majeure clause depends on the terms the contracting parties freely chose, and each clause must be construed according to its own terms because there is no "one size fits all" construction.[32]

2004, no pet.) ("[P]arty shall give notice and details of Force Majeure in writing to the other party as promptly as possible after its occurrence.").

[31] As examples, force majeure clauses may suspend performance obligations or lease termination during the period of prevention or delay. *See, e.g.*, *TEC Olmos*, 555 S.W.3d at 179 ("[T]he performance of any such obligation is suspended during the period of, and only to the extent of, such prevention or hindrance[.]"); *Roland Oil*, 2015 WL 870232, at *5 ("All obligations imposed by this agreement . . . shall be suspended while compliance is prevented[.]"); *Zurich Am.*, 157 S.W.3d at 464 (suspending obligations "during the continuance of any inability so caused"). Others may excuse performance based on whether the failure to perform was caused or affected by the force majeure event. *See, e.g.*, *El Paso Mktg.*, 383 S.W.3d at 140 n.6 (excusing party "from whatever performance is affected by the Event of Force Majeure to the extent so affected"); *Va. Power*, 297 S.W.3d at 403 ("[N]either party shall be liable to the other for failure to perform a Firm obligation, to the extent such failure was caused by *Force Majeure*."); *Kodiak 1981*, 736 S.W.2d at 716 ("[N]either party hereto shall be liable for any failure to perform the terms of this Agreement, when such failure is due to 'force majeure[.]'").

[32] *See Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 598 (Tex. 2018) (describing the construction of retained-acreage clauses in a similar manner); *see also Perlman*, 918 F.3d at 1248 ("[T]he 'doctrine' of force majeure should not supersede the specific terms bargained for in the contract."); *Roland Oil*, 2015 WL 870232, at *5 ("[W]e agree with Roland that the scope and effect of a force majeure clause depend ultimately on the specific language used in the contract and not on any traditional definition of the term[.]"); *Va. Power*, 297 S.W.3d at 402 ("The scope and effect of a '*force majeure*' clause depends on the specific contract language, and not on any traditional definition of the term."); *Allegiance Hillview, L.P. v. Range Tex. Prod., LLC*, 347 S.W.3d 855, 865 (Tex. App.—Fort Worth 2011, no pet.) ("'[W]hen the parties have themselves defined the contours of force majeure in

The force majeure clause in the MRC Lease addresses each of these types of variations.  The clause describes the force majeure event as "being a non-economic event beyond Lessee's control."  By requiring "Lessee's operations" to be delayed "by" a force majeure event, the clause imposes a causal-nexus requirement that is a necessary predicate to properly invoke the clause.[33]  For remedial action, a lessee must use its "best efforts to overcome the problem," and, "within 60 days after its commencement," a lessee must provide notice and include a "reasonable written description of the problem."  Finally, the clause provides a grace period that maintains the lease "during the continuance of such delay" while affording 90 days "to resume operations" after the "reasonable removal of such majeure," not to exceed a total of 180 days.

Although Point Energy raises other challenges to MRC's invocation of the force majeure clause, we focus our discussion on whether MRC satisfied the predicate causal-nexus requirement: "[w]hen Lessee's operations are delayed by an event of force majeure . . . ."  Specifically, we focus on what it means for "Lessee's operations" to be

---

their agreement, those contours dictate the application, effect, and scope of force majeure,' and reviewing courts 'are not at liberty to rewrite the contract or interpret it in a manner which the parties never intended.'" (quoting *Sun Operating*, 984 S.W.2d at 283)); *Zurich Am.*, 157 S.W.3d at 466 ("Regardless of its historical underpinnings, the scope and application of a force majeure clause depend on the terms of the contract."); *Sun Operating*, 984 S.W.2d at 283 (noting that the clause's "scope and application, for the most part, is utterly dependent upon the terms of the contract in which it appears").

[33] Dictionaries define "by" as "through the means or instrumentality of" or "[t]hrough the agency or action of."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 307 (2002); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 255 (5th ed. 2016).

"delayed by" a force majeure event and whether that requirement interacts with lease deadlines. MRC identifies the scheduled June 2 spudding of the Toot 211 well as the only "Lessee's operation[]" allegedly delayed for the purpose of the force majeure clause. And it is undisputed that if there had been no delay, the operation as scheduled would not have satisfied the May 21 continuous-drilling deadline to perpetuate the MRC Lease. Nevertheless, MRC argues it is irrelevant that the operation was already scheduled to commence after the deadline because "nothing in the [force majeure] clause here ties force majeure to performance or compliance [with lease deadlines]—just delayed operations." According to MRC, "delay" means to make late as to the operation's scheduled date but not in relation to the lease deadline for that operation.[34] Thus, even a slowdown of an operation erroneously scheduled to commence after the lease deadline could trigger the force majeure clause.

When viewed in isolation and taking an unduly literal interpretation, the phrase "Lessee's operations are delayed by an event of force majeure" could be read to support MRC's position. But we do not read contractual phrases in isolation,[35] and we must avoid "taking literalism too literally and adopting a wooden construction foreclosed by

---

[34] *See, e.g.*, *Delay*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 479 (5th ed. 2016) ("To cause to be later or slower than expected or desired[.]").

[35] *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 891 (Tex. 2019).

19

[the legal text's] context."[36]    "'Context,' after all, 'is a primary determinant of meaning.'"[37]  Words "must be construed in the context in which they are used," and their meaning "'turns upon use, adaptation and context as they are employed to fit various and varying situations.'"[38]  And a "vital part" of a text's context is "the *purpose* of the text," as gathered "from the text itself, consistently with the other aspects of its context."[39]

In light of the phrase's textual context of the MRC Lease's operation deadlines and the force majeure clause's grace periods and purpose, we cannot conclude that the contemplated "delay[]" of "Lessee's operations" is entirely divorced from the lease deadlines.  The MRC Lease repeatedly yokes operations with lease deadlines, which, if not met, result in lease termination, including:

---

[36] *Ojo v. Farmers Grp., Inc.*, 356 S.W.3d 421, 451 (Tex. 2011) (Willett, J., concurring); *see Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 151 (Tex. 2020) (declining to interpret a contested sentence in a contract in a "hyper-literal fashion"); *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 764 (Tex. 2018) ("[W]ords are simply implements of communication, and imperfect ones at that.  Oftentimes they cannot be assigned a rigid meaning, inherent in themselves." (quoting *Cal. Dep't of Mental Hygiene v. Bank of Sw. Nat'l Ass'n*, 354 S.W.2d 576, 579 (Tex. 1962))).

[37] *Brown v. City of Houston*, 660 S.W.3d 749, 754 (Tex. 2023) (quoting Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 167 (2012)).

[38] *URI*, 543 S.W.3d at 764 (quoting *Cal. Dep't of Mental Hygiene*, 354 S.W.2d at 579); *see* Scalia & Garner, *supra* note 37, at 323 ("[C]ontext is as important as sentence-level text.  The entire document must be considered.").

[39] Scalia & Garner, *supra* note 37, at 33.

20

- a drilling-commitment deadline;[40]

- a substitute-well deadline;[41]

- a continuous-drilling deadline;[42]

- a production-unit deadline;[43] and

- a review-of-production-units deadline.[44]

---

[40] "MRC agrees to commence drilling operations on or before the expiration of eighteen (18) months from the effective date of this lease . . . . Failure to timely commence drilling operations on the well will result only in termination of the lease[.]"

[41] "If, in the conducting of any of the drilling operations . . . MRC encounters any conditions or difficulties . . . [which] make further drilling and completion of any well impossible or impracticable, then MRC shall have the option to commence operations for the drilling of a substitute well within sixty (60) days after cessation of drilling operations on the well[.]"

[42] "'Continuous Drilling Program' means the period of time during which Lessee is timely commencing Actual Drilling of Continuous Program Wells and ending on the calendar day upon which more than 180 consecutive days have elapsed since the commencement of Actual Drilling of the most recent Continuous Program Well," and "Lessee may temporarily suspend automatic termination of this lease at the expiration of the primary term by conducting a Continuous Drilling Program."

[43] "[I]f production of oil and gas should cease from the Production Unit, this lease will not terminate as to such Production Unit so long as Lessee commences Actual Drilling of a new well or the Recompleting, Reworking or Refracing of an existing well on the Production Unit or before the expiration of 60 days from date of the cessation of production and proceeds with such operations with no cessation of more than 60 consecutive days until commercial production of oil and/or gas is restored."

[44] "At any time after the tenth anniversary date of this lease, if a Production Unit contains more acreage than is necessary to meet regulatory allowable and spacing requirements . . . upon request from Lessor, Lessee shall commence and diligently pursue either a Continuous Drilling Program on the Production Unit or Recompleting, Reworking or Refracing operations. If Lessee fails to commence a Continuous Drilling Program, Recompleting, Reworking or Refracing within 90 days of the request from Lessor . . . Lessee shall release this lease as to [that unnecessary] acreage[.]"

The operations described in these clauses are necessary to preserve the lease under certain circumstances and must be performed within specified time periods. If these operations were delayed by a force majeure event such that the lessee missed the corresponding deadline, then a force majeure clause, to be effective, would need to keep the lease in force during the delay and provide time for the lessee to resume the lease-preserving operations.

This force majeure clause does precisely that. Its expressly stated purpose is to keep the MRC Lease "in force during the continuance of such delay" of "Lessee's operations" and provide the lessee with 90 days "to resume operations." On the other hand, there would be no need for the clause to provide that remedy if the operation would not otherwise keep the lease in force or the delay did not cause a missed deadline. The textual context provides no indicia of the contracting parties' intent to cover a delay of an operation already scheduled to commence after a critical contractual deadline for perpetuating the lease. Indeed, the textual context signifies that the "delay[]" of "Lessee's operations" relates to lease deadlines and obligations. MRC's complete untethering of operations from their corresponding lease deadlines in claiming a "delay[]" of "Lessee's operations" is at odds with a fair reading of the force majeure clause and embraces a wooden, isolated literalism over a natural, contextual construction.[45]

---

[45] Scalia & Garner, *supra* note 37, at 33 (endorsing a "fair reading" interpretive approach that construes a legal text "on the basis of how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued" and considers the text's purpose derived "only from the text itself, consistently with the other aspects of its context").

MRC's construction of the phrase as applied to the June 2 scheduled operation also rests on circular reasoning. To properly invoke the force majeure clause, the delayed operation must be "Lessee's operations." Had there been no delay, however, the lease *would have* terminated before the June 2 scheduled operation. In that scenario and at the time of the scheduled operation, MRC would no longer have been the "Lessee[]" and would have been conducting the operation on someone else's property rather than on the lease.[46] In other words, MRC's June 2 operation—as scheduled and before any delay—would not have been "Lessee's operation[]" unless a savings clause would have perpetuated the MRC Lease until at least the operation's scheduled date. But this results in the following circularity: MRC's June 2 scheduled operation would be "Lessee's operation[]" only if the force majeure clause (or some other savings clause not at issue in this appeal) would have kept the MRC Lease in force through June 2; but MRC could properly invoke the force majeure clause to keep the lease in force

_____

[46] The parties agree that "Lessee's operations" refers to on-lease operations. *See supra* note 12. Although the parties do not dispute the on-lease requirement for "Lessee's operations," we note that in other contexts, depending on the lease terms and definitions, "operations" could include off-lease operations that are related to the lease. *See, e.g.*, Bruce M. Kramer, *Keeping Leases Alive in the Era of Horizontal Drilling and Hydraulic Fracturing: Are the Old Workhorses (Shut-in, Continuous Operations, and Pooling Provisions) Up to the Task?*, 49 WASHBURN L. J. 283, 306 (2010) (noting that with horizontal drilling "one needs to make sure that operations that take place off the leasehold premises are included" in the lease's definition because "if the vertical portion of the well bore needs to be reworked and the horizontal or lateral section is shut-in, the reworking operations will not necessarily be on the leased premises").

beyond the May 21 drilling deadline only if the delay of the June 2 scheduled operation was a delay of "Lessee's operations."

We conclude that an ordinary person using the phrase "[w]hen Lessee's operations are delayed by an event of force majeure," given its textual context, would not understand those words to encompass a 30-hour slowdown[47] of an essential operation that was already destined to be untimely due to a scheduling error.[48] Our construction is further buttressed by viewing the clause from a utilitarian perspective, "bearing in mind the particular business activity sought to be served, and avoiding unreasonable constructions when possible and proper."[49] Force majeure clauses like this one generally exist to allocate risk when a lessee encounters an irresistible force beyond a party's control that may lead to the harsh result of lease termination.[50] Here, the language the

---

[47] In its briefing, MRC argued that the clause "does not require any minimum amount of delay." At oral argument, however, MRC's counsel conceded that a *de minimis* exception is implied within the force majeure clause, but explained, "A day in the oil field is important. We've seen leases lost by somebody missing it by a day. . . . If we're getting into something that addresses what I would refer to as a *de minimis* kind of effect, that's for another day, that's for another case." As we need not reach the issue of whether a 30-hour delay falls within a *de minimis* exception, we agree with MRC's counsel that this question is "for another day [and] for another case."

[48] *See URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 764 (Tex. 2018) ("[O]ur quest is to determine, objectively, what an ordinary person using those words under the circumstances in which they are used would understand them to mean.").

[49] *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020) (quoting *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015)).

[50] Martin & Kramer, *supra* note 4, at § 683 ("Another such savings clause which has made its way into leases to protect lessees from liability or

24

contracting parties chose evinces that this force majeure clause's purpose is the same. But if an untimely operation would not otherwise suspend termination of the lease—even absent any delay—the alleged force majeure event does not impose any risk of lease termination. The risk of lease termination derives from the scheduling error, which the parties agree the force majeure clause is not designed to remedy.

Of course, parties are free to contract in a manner that either allocates the risk for when a lessee erroneously schedules an untimely operation or allows a lessee to invoke a force majeure clause based on operational delays entirely divorced from lease deadlines, regardless of whether such contractual language produces odd results or comports with a utilitarian perspective.[51] But the contracting parties to the MRC

---

loss of leases for causes beyond their control is the so-called *force majeure* clause."); 17 WILLISTON ON CONTRACTS *Particular clauses or provisions* § 50:58 (4th ed. 2022) ("The purpose of a force majeure clause is to relieve an oil and gas lessee from the harsh termination of the lease due to circumstances beyond the lessee's control that would make performance untenable or impossible."); Kuntz, *supra* note 26, at § 53.5 ("It is not uncommon for the oil and gas lease to contain a force majeure clause which is designed to relieve the lessee from the consequences of a failure to comply with the terms of the lease if such failure is the result of certain described causes."); RESTATEMENT (SECOND) OF CONTRACTS, introductory note to ch. 11 (1981) ("Contract liability is strict liability. It is an accepted maxim that *pacta sunt servanda*, contracts are to be kept. . . . The obligor who does not wish to undertake so extensive an obligation may contract for a lesser one by using one of a variety of common clauses [including] . . . a *force majeure* clause[.]").

[51] *See Burlington Res. Oil & Gas Co. v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 211 (Tex. 2019) (noting that parties are free to contract for odd results and "that lease drafters are not always driven by logic" (quoting *Chesapeake Expl., L.L.C. v. Hyder*, 483 S.W.3d 870, 874 (Tex. 2016))).

Lease did not do that, and the textual context here forecloses such a construction.[52]

Applying well-established contract-construction principles, we construe "Lessee's operations are delayed by an event of force majeure" to have a "certain and definite meaning"[53] that would not encompass a slowdown of MRC's June 2 scheduled operation to spud the Toot 211 well when that operation would not have met the May 21 deadline even if there had been no delay. We reverse the court of appeals' judgment as to the force majeure clause and render judgment that the clause did not extend MRC's drilling deadlines or perpetuate the MRC Lease.[54] Accordingly, as a matter of law, the MRC Lease terminated as to the

---

[52] MRC argues that the clause "uses a *soft-trigger/hard-cap* design," setting "a low threshold for lessees like MRC to declare force majeure (freeing the lessor—or its agent, the bank—from the burden of scrutinizing each claim)" but capping the lease extensions "at just 180 days." The clause, however, does not provide the lessee with unfettered discretion to declare force majeure, and even if the "soft trigger" is construed as a relatively "low threshold," we conclude that, as a matter of law, MRC did not satisfy it here by alleging the delay of an already untimely operation.

[53] *Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC*, 639 S.W.3d 682, 690 (Tex. 2022).

[54] The court of appeals also held that "even if there were a causal link requirement" between the force majeure event and a missed deadline, "there is a genuine issue of material fact regarding whether the off-lease delay caused MRC's missed deadline, or whether the delay resulted from a calendaring error by an MRC employee." 624 S.W.3d 643, 660 (Tex. App.—El Paso 2021). But the evidence the court of appeals relied on connected the force majeure event only with delaying the scheduled June 2 operation, not with missing the May 21 deadline. *Id.* at 660-61. We cannot agree with the court of appeals that this evidence, or any other evidence in the record, raised a fact issue on "whether the off-lease delay caused MRC's missed deadline[.]"

portion of the leasehold estate not included in production units when MRC failed to spud a new well by May 21, 2017.

## B. Retained Acreage

In its second issue, Point Energy complains of the court of appeals' decision to defer disposition of the dispute over the size of the production units MRC retained following lease termination. Point Energy's summary-judgment motion asserted that MRC's retained acreage was limited to 160 acres per production unit based on (1) the written-designation requirement and (2) how far the "wellbore extends horizontally in the producing formation." After concluding that Point Energy had not established that the lease had terminated, the court of appeals held that determining "the amount of acreage MRC may retain when, and if, its lease terminated" would require "imagin[ing] a scenario in which MRC's lease in fact terminated."[55] Accordingly, addressing the issue "when the lease may not terminate at all 'would create an impermissible advisory opinion'" and "'eschew the ripeness doctrine.'"[56]

We disagree that such a determination would create an impermissible advisory opinion or implicate the court of appeals' jurisdiction under the ripeness doctrine. "[I]n evaluating ripeness, we consider 'whether, *at the time a lawsuit is filed*, the facts are sufficiently developed so that an injury has occurred or is likely to occur, rather than

---

[55] *Id.* at 664.

[56] *Id.* (quoting *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 853 (Tex. 2000)).

27

being contingent or remote.'"[57] An intermediate appellate court's answer to a predicate merits question within the same lawsuit may make disposition of additional merits-based issues unnecessary to resolve the appeal, but it does not affect ripeness or, in the ordinary case, the appellate court's jurisdiction. As we recently explained:

> It may turn out, when the dust settles, that one element or another of a court's decision ended up being irrelevant to the ultimate outcome. That does not mean the court lacked jurisdiction to decide that part of the case. Even assuming the remaining issues were rendered superfluous by the court of appeals' resolution of [a predicate] question, the possibility remained that this Court would take a different view of [that] question, as we have done. The dispute over the remaining issues therefore remained live, and its resolution still impacted the parties' rights—even though the extent to which it did depended on how the case progressed in the future. Resolving the remaining issues would not have amounted to an advisory opinion by the court of appeals.[58]

We also noted that "[t]he prudential practice of courts to decline to reach issues not necessary to the disposition of a case should not be confused with the constitutional prohibition on advisory opinions" and whether the court of appeals "*could* have reached" or "was *obligated* to reach" those issues are two distinct inquiries.[59]

Because we have reversed the court of appeals' judgment as to the termination of the MRC Lease, we need not address whether the court

---

[57] *Robinson v. Parker*, 353 S.W.3d 753, 755 (Tex. 2011) (quoting *Gibson*, 22 S.W.3d at 851-52).

[58] *Tex. Comm'n on Env't Quality v. Maverick County*, 642 S.W.3d 537, 549 (Tex. 2022).

[59] *Id.* at 549-50.

*was* obligated to determine the production-unit size. The court will have the opportunity to address the issue in the future—assuming the parties maintain their current positions. When reversal necessitates consideration of issues raised in but not decided by the court of appeals, we ordinarily remand the case to that court for further proceedings.[60] Although we have discretion to take up those issues, we adhere to our usual practice and remand this issue to the court of appeals.[61]

### C. Tortious Interference

Point Energy's final issue concerns MRC's tortious-interference claims. As pleaded, MRC's claims are based on two theories of liability: (1) a primary theory of interference with the MRC Lease; and (2) if the MRC Lease had terminated, a secondary theory of interference with the leasehold interest in the retained acreage. In the court of appeals, MRC admitted that "once the trial court erroneously held that the MRC leases expired after May 21, 2017, MRC's primary theory of interference—which relied on actions taken in June 2017—fell by the wayside, leaving only the secondary 'acreage issue.'" After disagreeing with the trial court on the applicability of the force majeure clause, the court of appeals held that there are fact issues about "whether there existed a valid contract subject to interference" and as to the tortious-interference elements.[62] The court focused only on MRC's primary theory of interference without considering the secondary theory.

---

[60] *Id.* at 550.

[61] *See* TEX. R. APP. P. 53.4; *Maverick County*, 642 S.W.3d at 550-51.

[62] 624 S.W.3d 643, 665-68 (Tex. App.—El Paso 2021).

29

We have agreed with the trial court that the force majeure clause did not extend the MRC Lease as a matter of law. The court of appeals' contrary conclusion led to its erroneous determination that fact issues exist as to each tortious-interference element under MRC's primary theory of liability. We therefore reverse the court's judgment on this issue and render judgment in part that MRC take nothing on its tortious-interference claims to the extent they are based on the lease perpetuating beyond May 21, 2017. The court of appeals, however, did not consider MRC's secondary theory of interference. Because the relevant evidence may relate to the question of the production-unit size, which we have remanded, we also remand the tortious-interference issue to the extent it relates to the retained acreage.

## III. Conclusion

We reverse the court of appeals' judgment on the force majeure and tortious-interference issues, render judgment that the force majeure clause did not extend the lease, render a take-nothing judgment in part on MRC's tortious-interference claims, and remand the case to the court of appeals to consider the remaining issues.

John P. Devine
Justice

**OPINION DELIVERED:** April 21, 2023

30