# IN THE SUPREME COURT OF TEXAS

No. 15-0935

XOG OPERATING, LLC AND
GERONIMO HOLDING CORPORATION, PETITIONERS,

v.

CHESAPEAKE EXPLORATION LIMITED PARTNERSHIP AND
CHESAPEAKE EXPLORATION, L.L.C., RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SEVENTH DISTRICT OF TEXAS

**Argued January 9, 2018**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

This case and a companion, *Endeavor Energy Resources, L.P. v. Discovery Operating, Inc.*,[1] also decided today, require us to interpret retained-acreage provisions in oil-and-gas lease instruments. We lay out more fully in *Endeavor* the regulatory and industry contexts in which the provisions are used and the principles that guide our analysis. Each case turns on the text of the retained-acreage provision at issue. In *Endeavor*, we hold that "a governmental proration unit

---

[1] No. 15-0155, slip op. (Tex. Apr. 13, 2018).

assigned to a well" refers to acreage assigned by the operator, not by field rules.[2] Here, we hold that

acreage "included within the proration unit for each well . . . prescribed by field rules" refers to

acreage set by the field rules, not acreage assigned by the operator. We affirm the judgment of the

court of appeals.[3]

I

By a term assignment,[4] XOG[5] conveyed to Chesapeake[6] its rights as lessee under 4 oil-and-

---

[2] *Id.* at 16, 21, 29.

[3] 480 S.W.3d 22 (Tex. App.—Amarillo 2015).

[4] A term assignment is a type of farmout agreement—a "very common form of agreement . . . whereby the owner of a lease not desirous of drilling at the time agrees to assign the lease, or some portion of it . . . to another operator who is desirous of drilling the tract." *Mengden v. Peninsula Prod. Co.*, 544 S.W.2d 643, 645 n.1 (Tex. 1976) (quoting WILLIAMS & MEYERS, OIL AND GAS LAW, MANUAL OF TERMS 167 (1971)) (omissions in original). The assignment may be for a fixed term of a definite period of years or for a fixed term followed by an indefinite period (e.g., 10 years and as long thereafter as oil and gas is produced). *See* 2 PATRICK H. MARTIN & BRUCE M. KRAMER, WILLIAMS & MEYERS, OIL AND GAS LAW § 331 (LexisNexis Matthew Bender 2017).

> [I]n a conditional assignment, the farmee acquires title to the property when the agreement is made. That title is subject to either an obligation to re-convey the farmee's interest to the farmor if the farmee fails to complete its obligations under the agreement or to automatically terminate the agreement if the farmee does not perform the conditions subsequent. These conditional farmouts often take the form of a term assignment wherein the farmor executes an assignment to the farmee for a specific term, and at the expiration of that term, the farmee retains a certain number of acres around each well drilled under the assignment and re-conveys the remaining acreage to the farmor.

Jason S. Brookner et al., *This Land Is Your Land, This Land Is My Land: Farmout Agreements in Bankruptcy*, 13 TEX. J. OIL, GAS, & ENERGY L. 23, 27 (2018) (footnotes omitted). Professor John Lowe has written:

> The origin of the term "farmout" is not clear. Professor Hemingway has said that the term's use goes as far back as ancient Roman times, when the state transferred the right to collect certain taxes to private individuals who received a fee for their services. Other commentators have attributed "farmout" to the term used in baseball:
>
> > [I]n the oil and gas industry it has substantially the same connotation as it has in the more familiar baseball vernacular. Like the rookie ballplayer who may be farmed out to a minor league team for further training, an oil and gas lease may be farmed out for development. In baseball, the major league team frequently retains some kind of interest in the player, and the grantor in a farm-out transaction retains some kind of property interest in the oil and gas lease.

gas leases covering approximately 1,625.80 acres in 3 sections of land in Wheeler County.[7] The assignment's primary term was 2 years and "as long thereafter as operations"—defined to include "drilling" and "completing"—"are conducted upon said lease with no cessation for more than sixty (60) consecutive days". Under the retained-acreage provision, the assigned interest would revert to XOG after the primary term,

> **save and except that portion** of [the leased acreage] **included within the proration** or pooled **unit of each well** drilled under this Assignment and producing or capable of producing oil and/or gas in paying quantities. **The term "proration unit"** as used herein, **shall mean the area within the surface boundaries of the proration unit then** established or **prescribed by field rules** or special order of the appropriate regulatory authority for the reservoir in which each well is completed. **In the absence of such field rules** or special order, **each proration unit shall be deemed to be 320 acres** of land in the form of a square as near as practicable surrounding[] a well completed as a gas well producing or capable of production in paying quantities . . . .[8]

(Emphasis added.) More simply, as important to the issues before us, Chesapeake would retain for each well the acreage "included within the proration . . . unit" "prescribed by field rules" or,

---

Whatever the term's origin, "farmout" has become firmly entrenched in the oil and gas industry, though the courts did not use it until 1957.

John S. Lowe, *Analyzing Oil and Gas Farmout Agreements*, 41 Sw. L.J. 759, 763–764 (1987) (quoting C. RUSSELL & R. BOWHAY, INCOME TAXATION OF NATURAL RESOURCES ¶ 7.02 (1986)).

[5] "XOG" includes petitioners XOG Operating, LLC and Geronimo Holding Corporation and their predecessors.

[6] "Chesapeake" includes respondents Chesapeake Exploration Limited Partnership and Chesapeake Exploration, L.L.C. and their predecessors.

[7] Three leases covered all of Sections 6 and 7, Block E, GW Jacobs Survey, totaling 980 acres, which the parties refer to as the Legg land. Section 6 is adjacent to and south of Section 7. The 4th lease covered all of Section 6, Block 1, B&B Survey, comprising 645.80 acres, which the parties refer to as the Britt land. Britt Section 6 is adjacent to and east of Legg Section 6. The entire area is thus L-shaped. The assignment included all the acreage except existing wellbores.

[8] The parties agree that the "appropriate regulatory authority" referenced in the provision is the Texas Railroad Commission and that no "special order" of the Commission applies here.

3

"absen[t] . . . field rules", 320 acres. The acreage not retained by Chesapeake would revert to XOG on termination of the assignment, and Chesapeake was to "promptly provide [XOG] with a fully executed and recordable release of this Assignment and reassignment to [XOG] for all lands and depths which have so terminated, on a form satisfactory to [XOG], free and clear".

Chesapeake completed 6 wells during the primary term of the assignment, all producing or capable of producing gas in paying quantities.[9] Five of the 6 wells are located in the Allison-Britt Field,[10] for which the Railroad Commission has promulgated field rules. Rule 2 provides:

> **The acreage assigned to the individual gas well for the purpose of allocating allowable gas production thereto shall be known as the prescribed proration unit.** No proration unit shall consist of more than three hundred twenty (320) acres except as hereinafter provided; . . . provided that tolerance acreage of ten (10) percent shall be allowed for each unit so that an amount not to exceed a maximum of three hundred fifty-two (352) acres may be assigned. **For allowable assignment purposes, the prescribed proration unit shall be a three hundred twenty (320) acre unit**, and each unit containing less than three hundred twenty (320) acres shall be a fractional proration unit.

The "prescribed" proration unit is 320 acres, though "tolerance acreage" can increase its size to as much as 352 acres. A unit smaller than 320 acres is "a fractional proration unit." Chesapeake's 6th well is located in the Stiles Ranch Field,[11] for which there are no field rules.

---

[9] Chesapeake completed 4 wells before the 2nd anniversary of the assignment and spudded 2 others, which were completed a few weeks later. None of the wells was in a pooled unit.

[10] These are the Legg 3-6(306) and Legg 2-6(206) in the northern and southern halves of Legg Section 6, respectively; the Legg 3-7(307) and Legg 2-7(207) in the northern and southern halves of Legg Section 7, respectively; and the Britt 3-6(306) in the northern half of Britt Section 6.

[11] This is the Britt 6-6(606) in the southern half of Britt Section 6. Chesapeake's motion for summary judgment states that this well "was permitted in the Allison-Britt Field but placed in the Stiles Ranch Field when drilled", citing its expert's report referring to "wells drilled in the Stiles Ranch (Granite Wash Cons) Field." XOG's motion for summary judgment states that "[e]ach of the relevant wells was completed in the Allison-Britt (12350) Field", citing its expert's affidavit. But the motion includes a chart showing that the Britt 6-6(606) was in the Stiles Ranch Field and attaches a verified P-15 stating that it was "completed in the Stiles Ranch (Granite Wash) Field". The P-15 is dated well after the

4

Chesapeake filed a Form P-15 for each well with the Railroad Commission, assigning a proration unit. Four forms, together assigning a total of 800 acres for 4 wells in the Allison-Britt Field, were filed during the primary term of the assignment.[12] XOG contends that Chesapeake's primary-term P-15 forms determine the acreage it continues to hold under the retained-acreage provision: the 800 acres designated, plus 2 acres for each of the other 2 wells. This would result in the reversion of 821.80 acres to XOG.[13] Chesapeake, on the other hand, asserts that its retained acreage is that "prescribed by field rules": 320 acres for each of the 5 wells in the Allison-Britt Field, plus 320 "deemed" acres for the well in the Stiles Ranch Field without field rules, for a total of 1,920 acres. Thus, in Chesapeake's view, it retained all of the assigned acreage.

Chesapeake refused to release or reassign to XOG any acreage covered by the assignment. XOG sued Chesapeake to construe the retained-acreage provision, and each side moved for summary judgment. The trial court granted Chesapeake's motion, denied XOG's, and rendered a

expiration of the primary term of the assignment. XOG states in a post-argument supplemental brief that the Britt 6-6(606) "was initially placed in the Allison-Britt Field and remained" there until after the primary term of the assignment expired, and "was later moved to the Stiles Ranch Field". Pet'rs' Post-Submission Br. 8 n.16. But XOG does not cite to the record for support. XOG does not argue that the factual issue precluded summary judgment for Chesapeake. Consistent with the trial court's grant of Chesapeake's motion for summary judgment and denial of XOG's, we assume Chesapeake's position is correct.

[12] P-15 Forms for the Legg 3-6(306) and Britt 6-6(606), filed after the primary term expired, designated proration units of 163.33 acres and 40 acres, respectively.

[13] This is XOG's allegation in its live pleadings. XOG does not expressly argue that Chesapeake lost the 2 wells because a Form P-15 was filed after the primary term. But in its motion for summary judgment and its briefs in this Court, XOG has argued that Chesapeake retained no acreage for the Britt 6-6(606) because it "would be located wholly within the Britt 3-6's 320 acre proration unit". Pet'rs' Br. 20 n.8. Thus, by this alternative argument, Chesapeake retained only 802 acres, and 823.80 should revert to XOG. *Id.* at 21. Under XOG's theory, this is true irrespective of which field the Britt 6-6(606) is in. Chesapeake asserted in its motion for summary judgment that under the retained-acreage provision, it retained 320 acres for the Legg 3-6(306) under the Allison-Britt Field rules, and 320 "deemed" acres for the Britt 6-6(606) in the Stiles Ranch Field because it was not covered by field rules. Consistent with the trial court's denial of XOG's motion for summary judgment and grant of Chesapeake's motion, we hold XOG to its pleadings.

final judgment that XOG take nothing. A divided court of appeals affirmed.[14] We granted XOG's petition for review.[15]

## II

Our opinion today in *Endeavor* fully sets out the principles that guide our analysis of a retained-acreage provision.[16] Such provisions are contractual[17] and vary widely because parties are free to contract in any way they choose not prohibited by law.[18] As with other agreements determining interests in real property, special interpretation rules apply.[19] Specifically, a retained-acreage provision can impose a special limitation on a general grant of a mineral interest only if "the language is so clear, precise, and unequivocal that we can reasonably give it no other meaning."[20] Retained-acreage provisions are "subject to the state's police power to conserve and develop" oil and gas,[21] specifically, by Railroad Commission statewide and field rules.[22] One means the Commission uses to prevent waste and promote conservation and development is by setting a

---

[14] 480 S.W.3d 22 (Tex. App.—Amarillo 2015).

[15] 61 Tex. Sup. Ct. J. 71 (Oct. 27, 2017).

[16] No. 15-0155, slip op. (Tex. Apr. 13, 2018).

[17] *Id.* at 7.

[18] *See id*.

[19] *Id.* at 8.

[20] *Id.* at 27 (quoting *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002)).

[21] *Id.* at 8 (quoting *Seagull Energy E & P, Inc. v. R.R. Comm'n*, 226 S.W.3d 383, 389 (Tex. 2007)).

[22] *Id.* at 8–9.

proration unit for each well to determine its maximum allowable production.[23] An operator must generally file a Form P-15 stating the acreage in a proration unit accompanied by a plat describing its location.[24] And as with any contract, the parties to a retained-acreage provision are presumed to know the law and to have stated their agreement in light of it.[25]

XOG's assignment to Chesapeake rather plainly states that at the end of the primary term, all land reverts to XOG except acreage "included within the proration . . . unit of each well", meaning "the area within the surface boundaries of the proration unit then . . . prescribed by field rules . . . . In the absence of such field rules . . . , each proration unit shall be deemed to be 320 acres". The Allison-Britt Field rules state that "[f]or allowable assignment purposes, the prescribed proration unit shall be a [320] acre unit". A unit may be as much as 10% larger with the addition of tolerance acreage. A smaller unit is a "fractional unit". The "proration unit . . . prescribed by" the Allison-Britt Field rules is 320 acres. Because no field rules apply to the well in the Stiles Ranch Field, the "deemed" proration unit is 320 acres. The acreage in the 6 proration units exceeds the assigned acreage. Therefore, none reverted to XOG.

XOG argues that our interpretation of the retained-acreage provision ignores its limitation to acreage "included within" a proration unit. Only an operator, XOG argues, not the Railroad Commission, can include acreage within a proration unit, and only by filing a Form P-15 and plat

---

[23] *Id.* at 9.

[24] *Id.*

[25] *See Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 483 (Tex. 2016); *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 n.3 (Tex. 1990) ("However violent the presumption may be that every man knows the law, it nevertheless conclusively prevails." (quoting *Kasch v. Anton*, 81 S.W.2d 1097, 1100 (Tex. Civ. App.—Austin 1935, no writ))).

for a well. But the provision itself refutes the argument. The provision equates the acreage "included within" a proration unit with that "prescribed" by field rules. The Allison-Britt Field rules expressly "prescribe[]"—the same word—320 acres. Moreover, under the retained-acreage provision, absent field rules, 320 acres are "deemed" to be "included within" a proration unit, regardless of whether the operator has filed a Form P-15.

XOG argues that the retained-acreage provision here should apply no differently than the provision in *Endeavor*, which allowed the operator to retain land and depths within "a governmental proration unit assigned to a well". But the field rules in *Endeavor* referred to assignments by operators "claim[ing]" acreage. The field rules in this case also refer to "assigned" acreage, but unlike the field rules in *Endeavor*, they also "prescribe" proration units. The two are not mutually exclusive. More than 50 years ago, in *Jones v. Killingsworth*, we explained that the Railroad Commission may "prescribe" the size of a proration unit while at the same time permitting operators to designate other sizes.[26] That is exactly what the Commission has done in the Allison-Britt Field rules. They prescribe 320 acres but permit slightly larger and fractional units. In *Endeavor*, neither the retained-acreage provision nor the field rules refer to a "prescribed" proration unit.

XOG argues that the field rules at issue set only a maximum size for proration units. That is true, but the maximum is 352 acres, not 320 acres. Unless "tolerance acreage" is "allowed", or a fractional unit is elected by an operator, which might be required given spacing and other considerations, the "prescribed proration unit shall be" 320 acres.

---

[26] *See* 403 S.W.2d 325, 328 (Tex. 1965).

XOG argues that the field rules set the size of proration units expressly "for the purpose of allocating allowable gas production", not for the purpose of determining the application of a retained-acreage provision. That, too, is true. But XOG and Chesapeake were free to incorporate the field rules' prescribed proration unit size into their assignment to govern the retained-acreage provision, and that is what they plainly did.

Even if XOG's reading of the provision were reasonable, it would operate to further restrict the interest XOG assigned Chesapeake, and we cannot read it to do so unless it is so "clear, precise, and unequivocal that we can reasonably give it no other meaning."[27] For the reasons we have explained, we cannot do so.

XOG contends that the results in this case and *Endeavor* will generate confusion in the industry. But unquestionably, parties can contract as they will within the law, and when it comes to retained-acreage provisions, they do exactly that. The parties and amici curiae in both cases acknowledge that differences abound. This case and *Endeavor* apply the same principles and ascribe the words the parties chose their plain meaning. That is not confusing.

We hold that in its assignment from XOG, Chesapeake retained 320 acres included within the proration units for each of 5 wells in the Allison-Britt Field, and another 320 acres deemed included within the proration unit for the well in the Stiles Ranch Field.

*     *     *     *     *

---

[27] *Endeavor,* slip op. at 27 (quoting *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002)).

9

The judgment of the court of appeals is

*Affirmed.*

_____
Nathan L. Hecht
Chief Justice

Opinion delivered: April 13, 2018

10